Filed 11/4/16

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| M. STRASNER, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> TOUCHSTONE WIRELESS REPAIR AND LOGISTICS, LP et al., <br><br> Defendants and Respondents. | D068865 <br><br><br> (Super. Ct. No. 37-2014-00013884-CU-PO-CTL) |

APPEAL from an order of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge.  Affirmed.


Kristensen Weisberg, John P. Kristensen and David L. Weisberg; Law Office of Gary Simms and Gary L. Simms for Plaintiff and Appellant.

Slater Hersey & Lieberman, Mark K. Slater, Elise K. Sara and Neil J. Cooper for Defendants and Respondents.

M. Strasner sued out-of-state defendants Brightpoint, Inc. (Brightpoint), Brightpoint North America, LP (BPNA), Touchstone Wireless Repair and Logistics, LP (Touchstone) and Touchstone Acquisition, LLC (TAL) (collectively, Defendants) for

injuries she suffered when a Touchstone employee allegedly uploaded a private photograph of Strasner to her Facebook page from a mobile telephone she had returned to T-Mobile. The court granted Defendants' motion to quash service of the summons and amended complaint for lack of personal jurisdiction. Strasner appeals, contending she made a sufficient showing of Defendants' contacts with California, both directly and through their California parent corporation, to subject them to personal jurisdiction. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Strasner entered into a wireless services contract with T-Mobile in 2010, in Santa Monica. Strasner's account was associated with a Los Angeles telephone number. In 2012, while living in New York, Strasner terminated her contract with T-Mobile and returned her mobile telephone to a T-Mobile store in New York. An employee at the store claimed to have erased all of Strasner's personal information from the mobile telephone, but the information allegedly remained. T-Mobile sent the telephone to a facility in Texas, operated by Touchstone, for refurbishing. Strasner alleges that while her former mobile telephone was at the facility, an employee viewed Strasner's personal data and used the telephone to upload a sensitive photograph of Strasner to her Facebook page and newsfeed. In May 2012, Strasner learned of the photograph's posting and immediately removed it, but several people had already seen the photograph. As a result, Strasner suffered severe emotional distress and embarrassment.

Strasner moved back to California in 2013 and sued T-Mobile and various Doe defendants in 2014, alleging (among other things) invasion of privacy, negligence, and

violation of California Business and Professions Code section 17200 et seq. In 2015, she amended the complaint to name Ingram Micro, Inc. (Ingram), a California corporation, and she further amended the complaint to substitute Defendants for fictitiously named Does. Defendants filed a motion to quash service of the summons and amended complaint against them for lack of personal jurisdiction. Ingram did not contest personal jurisdiction.

In support of their motion to quash, Defendants submitted a sworn declaration from the senior director of Brightpoint. According to the director, by 2012, Touchstone, TAL and BPNA were all indirect wholly owned subsidiaries of Ingram, but each remained a separate legal entity and Ingram never assumed liability for any of them. As to each Defendant's contacts with California, the declaration established as follows: (1) Brightpoint was not incorporated in California and did not have its principal place of business here; it did not own property or have an office in California in 2012 or 2015, and was not currently registered to do business in California; (2) BPNA did business as Ingram Micro Mobility, was not incorporated in California and did not have its principal place of business here; it did not own property or have an office in California in 2012 or 2015, and was not registered to do business in California in 2012 or 2015, it had some California customers, but derived only a small percentage of its domestic revenue from those customers and it did not play any role in Touchstone's refurbishing of mobile telephones for T-Mobile; (3) TAL was not incorporated in California and did not have its principal place of business here, it did not conduct business, own property or have an office in California in 2012 or 2015, and was not registered to do business in California

3

in 2012 or 2015; and (4) Touchstone was not incorporated in California and did not have its principal place of business here, it did not employ persons, conduct business, own property or have an office in California in 2012 or 2015, and was not registered to do business in California in 2012 or 2015. At all relevant times, Touchstone had a contract with T-Mobile, whereby it provided logistics and repair services to T-Mobile, including refurbishing mobile telephones, at its facility in Texas. Touchstone had a single customer in California (not T-Mobile), for whom it provided services at its Texas facility, but Touchstone derived only a small percentage of its United States revenue from the California customer.

In opposition to Defendants' motion to quash, Strasner contended California could assert general jurisdiction over Defendants through their California-based parent corporation, Ingram, under an agency theory. She further contended Touchstone and Brightpoint were subject to specific jurisdiction in California, as a result of the Touchstone employee's intentional posting to Strasner's Facebook account, because the impact of the posting was aimed at her Facebook friends, the vast majority of whom are from California. She further emphasized Touchstone's connections to California through Ingram, Touchstone's California expenditures, and Touchstone's and Brightpoint's "integration" with Ingram but did not describe how those contacts related to the litigation or established specific jurisdiction. Strasner also submitted a declaration, attesting the vast majority of her Facebook friends reside in California and it would be apparent to anyone who accessed her Facebook account that any posting to her account "would be aimed primarily at those California residents."

4

In addition, Strasner had taken jurisdictional discovery and presented the following evidence with her opposition to Defendants' motion to quash: (1) Brightpoint's revenue was reported separately by parent Ingram in 2012, but by 2014, Ingram had begun consolidated reporting of Brightpoint's financials, Brightpoint no longer was publicly traded and ceased filing SEC reports, Brightpoint no longer had its own website and its trademarks were all owned by Ingram, and some managers at Ingram oversaw Brightpoint managers in human resources and accounting, but were not engaged in Brightpoint's day-to-day operations; (2) BPNA packaged and distributed mobile retail kits for wireless service providers; (3) TAL's president signed a contract with T-Mobile on behalf of Touchstone and the same person described himself as the president of "North America Mobility at Ingram Micro" on his LinkedIn page; and (4) Touchstone refurbished approximately 80 percent of the T-Mobile telephones it received and sent approximately 90 to 95 percent of the refurbished telephones to Brightpoint to be shipped to T-Mobile or T-Mobile customers, it made payments to vendors in California in 2014, and its former website redirects users to an Ingram-branded website. Strasner also provided SEC filings in which Ingram referred to itself and its subsidiaries as working together, "combining" forces and offering "end-to-end" supply chain services and "in-house repair" operations.

The trial court granted Defendants' motion to quash, finding Strasner had failed to demonstrate facts to support the exercise of general or specific jurisdiction as to any of the Defendants.

DISCUSSION

I. *General Legal Principles and Standard of Review*

California courts may exercise jurisdiction over a nonresident on any basis consistent with the federal or state Constitution. (Code Civ. Proc., § 410.10.) To comport with federal and state due process, California may only exercise jurisdiction when a defendant has sufficient minimum contacts with the state to satisfy " 'traditional notions of fair play and substantial justice.' " (*International Shoe Co. v. Washington* (1945) 326 U.S. 310, 316; *Snowney v. Harrah's Entertainment, Inc.* (2005) 35 Cal.4th 1054, 1061 (*Snowney*).) Under the minimum contacts test, we examine the quality and nature of a defendant's action to determine whether requiring him to submit to jurisdiction in California is reasonable and fair. (*Snowney*, at p. 1061.)

When a defendant challenges jurisdiction through a motion to quash, the plaintiff bears the burden to demonstrate facts, as to each nonresident defendant, justifying the exercise of jurisdiction by a preponderance of evidence. (*In re Automobile Antitrust Cases I & II* (2005) 135 Cal.App.4th 100, 110 (*Automobile Antitrust*).) The plaintiff must provide specific evidentiary facts, through affidavits and other authenticated documents, sufficient to allow the court to independently conclude whether jurisdiction is appropriate. (*Ibid.*) The plaintiff cannot rely on allegations in an unverified complaint or vague and conclusory assertions of ultimate facts. (*Ibid.*)

On review, we apply the substantial evidence standard to the trial court's factual determinations regarding conflicting evidence. (*Automobile Antitrust, supra*, 135 Cal.App.4th pp. 113-114.) However, we independently review the trial court's

6

conclusions regarding the legal significance of the facts. (*Buchanan v. Soto* (2015) 241 Cal.App.4th 1353, 1362.) When the facts are undisputed, the issue of jurisdiction is purely a question of law. (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 449 (*Vons*).)

## II. *General Jurisdiction*

### A. Legal Principles

Personal jurisdiction may be general (all purpose) or specific. The standard for general jurisdiction is considerably more stringent than that for specific jurisdiction. (*Paneno v. Centres for Academic Programmes Abroad Ltd.* (2004) 118 Cal.App.4th 1447, 1455.) A defendant is subject to general jurisdiction when it has substantial, continuous and systematic contacts in the forum state, i.e., its contacts with the forum are so wide-ranging that they take the place of a physical presence in the state. (*Vons, supra*, 14 Cal.4th at pp. 445-446; *Daimler AG v. Bauman* (2014) 571 U.S. ___ [134 S.Ct. 746, 754] (*Daimler*) [court may assert general jurisdiction over a nonresident corporation for all purposes when the corporation's contacts with the state are so continuous and systematic that it can be considered "at home" there].) In assessing a defendant's contacts with the forum for purposes of general jurisdiction, we look at the contacts as they existed from the time the alleged conduct occurred to the time of service of summons. (*DVI, Inc. v. Superior Court* (2002) 104 Cal.App.4th 1080, 1100-1101 (*DVI*).) For a corporation, its domicile, place of incorporation, and/or principal place of business within a state constitute the paradigm bases for establishing general jurisdiction. (*Goodyear Dunlop Tires Operations, S.A. v. Brown* (2011) 564 U.S. 915, 924 (*Goodyear*).) A

7

defendant corporation's substantial sales in a state are insufficient to establish general jurisdiction, as the general jurisdiction analysis turns on the nature of the defendant's continuous corporate *operations* within a state. (*Daimler*, at p. 761.)

However, even if a defendant lacks sufficient direct contacts with a forum to establish general jurisdiction, a plaintiff may impute the minimum contacts of a California subsidiary to a nonresident parent through theories of alter ego or agency. (*DVI, supra*, 104 Cal.App.4th at p. 1093.) To invoke the alter ego doctrine, a plaintiff must show there is such a unity of interest and ownership between the two entities that they do not have separate personalities and it would be inequitable to treat the conduct as attributable to only one of the entities. (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 538 (*Sonora*).) To impute contacts under a theory of agency, a plaintiff must demonstrate that the parent "exercised pervasive and continuous control over [the subsidiary's] day-to-day operations that went beyond the normal parent-subsidiary relationship." (*BBA Aviation PLC v. Superior Court* (2010) 190 Cal.App.4th 421, 433 (*BBA Aviation*).)

For example, in *BBA Aviation,* the plaintiff contended the California subsidiary's contacts should be imputed to the out-of-state parent when, among other things: the two corporations had common officers and directors; the parent's executive management committee participated in workshops with the subsidiary; and the parent's name and logo appear on the subsidiary's signage uniforms, business cards and documents. (*BBA Aviation, supra*, 190 Cal.App.4th at pp. 434-435.) The court determined that the subsidiary had its own corporate officers, human resources staff, and financial personnel

8

and concluded the presence of interlocking directors and officers was considered a normal attribute of ownership. (*Id.* at p. 434.) In addition, the court found branding with the parent's logo insufficient to establish control. (*Id.* at p. 435.) The court therefore refused to impute the subsidiary's forum contacts to its parent corporation under an agency theory. (*Id.* at p. 433.)

Similarly, in *DVI,* the Court of Appeal examined the relationship between a parent corporation and its subsidiary and concluded that the plaintiffs' allegations of alter ego and agency were insufficient to establish general jurisdiction over the nonresident parent. (*DVI, supra*, 104 Cal.App.4th at p. 1094.) The plaintiffs presented evidence that the two corporations used consolidated financial statements containing collective terms such as "we" to refer to the parent and its subsidiaries; the subsidiary advertised in California under the parent's brand name; and the parent had overlapping directors with the subsidiary. (*Id.* at pp. 1095-1097.) The court determined the use of consolidated financial statements and inclusive language fails to prove the parent and subsidiaries are a single entity in practice; collective advertising under a common brand does not establish general jurisdiction; and the mere existence of common directors is insufficient to establish alter ego, as overlapping corporate officers and directors are normal attributes of a parent-subsidiary relationship. (*Ibid.*) On these same facts, the court concluded that the plaintiffs failed to prove an agency relationship, as they did not establish such a degree of control over the resident entity so that it could be described as only a means through which defendant acts or no more than a department of the parent. (*Id.* at p. 1094.)

B. Analysis

Here, Strasner has failed to establish that any of the Defendants have substantial, continuous and systematic contacts with California sufficient to establish general jurisdiction. Strasner does not contend any defendant has sufficient direct contacts with California to support general jurisdiction. Nor does she contend she can establish an alter-ego relationship between Ingram and any of its subsidiaries. Instead, she argues that general jurisdiction is appropriate over each defendant subsidiary because each is an agent of Ingram, the California parent company. There does not appear to be any California case in which an agency theory has been used to impute a California parent company's forum contacts to an out-of-state subsidiary.[1] In addition, such "reverse agency" theory appears at odds with the underlying principle of imputation through

---

[1] Some plaintiffs in other forums have attempted to rely on a similar "reverse agency" or "single enterprise" theory to impute a parent's forum contacts to a nonresident subsidiary, but their arguments have not been addressed on the merits. (See *Goodyear, supra*, 564 U.S. at pp. 930-931 [refusing to consider appellants' argument that general jurisdiction was appropriate due to the interrelatedness between the resident parent and nonresident subsidiaries because appellants had failed to raise it below or in opposing the petition for certiorari]; *Ranza v. Nike* (2015) 793 F.3d 1059, 1071 [refusing to consider the reverse agency argument because the Ninth Circuit's agency test was characterized by the Supreme Court in *Daimler* as too broad to comply with due process].) The agency test formerly used by the Ninth Circuit differs from that applied by California courts, as it allowed a finding of agency whenever the work performed by a subsidiary was so "important" to its parent that the parent would have performed the services itself in the subsidiary's absence. (*Daimler, supra*, 134 S. Ct. at p. 759.) The Supreme Court characterized this inquiry as "stack[ing] the deck" in favor of jurisdiction. (*Ibid.*) In contrast, the California test considers whether a parent exercised excessive control over its subsidiary's forum-based operations beyond that of a normal parent-subsidiary relationship. *(BBA Aviation, supra*, 190 Cal.App.4th at p. 433.) The reasoning in *Daimler* therefore does not preclude imputing a resident's contacts to a nonresident under the California version of the agency test.

10

agency, which relies on a nonresident entity exerting power over the day-to-day operations of the resident corporation (*Sonora, supra*, 83 Cal.App.4th at p. 542), akin to a nonresident puppeteer pulling the strings of a California puppet. However, even if such reverse agency theory were viable, Strasner has not established that Ingram's control over any Defendant is so pervasive and continual to require Ingram's contacts with California to be imputed to it under an agency theory.

Regarding Brightpoint, Strasner demonstrated that by 2014, it had issued consolidated revenue reports with Ingram, was no longer publicly traded, was described in an SEC filing as a "combination" with Ingram and as working "together" with it, used Ingram branding, discontinued its separate website and engaged in some integration of accounting and human resources functions, in that some managers at Ingram oversee Brightpoint managers in human resources or accounting. However, the two corporations had separate management teams and facilities and Strasner offered no evidence that Ingram directs Brightpoint's day-to-day operations. On this evidence, Strasner fails to establish any agency relationship beyond that generally associated with ownership. Normal characteristics of ownership, such as some degree of direction and oversight, interlocking directors and officers, a close financial connection, consolidated reporting, and shared professional services are insufficient to establish an agency relationship. (*Sonora, supra*, 83 Cal.App.4th at pp. 540-541.) Likewise, evidence of co-branding or the broad use of terms linking the corporations together in SEC filings, or other materials, do not establish control rising to the level of an agency relationship. (*BBA Aviation, supra*, 190 Cal.App.4th at pp. 434-435; *DVI, supra*, 104 Cal.App.4th at p. 1096; *Sonora*,

11

at pp. 549-550.)

The same is true for BPNA, as Strasner has failed to establish any connection between it and Ingram other than their general corporate relationship and their use of co-branding, which are not sufficient to establish agency. (*BBA Aviation, supra*, 190 Cal.App.4th at p. 432; *DVI, supra*, 104 Cal.App.4th at p. 1096.) Regarding TAL, Strasner asserts TAL's president signed a contract with T-Mobile on behalf of Touchstone and is described as the president of "North America Mobility at Ingram Micro" on his LinkedIn page, but even if there were evidence TAL and Ingram had an overlapping officer, the mere existence of overlapping officers and directors is insufficient to support a finding of agency. (*BBA Aviation, supra*, 190 Cal.App.4th at p. 434.) Finally, as to Touchstone, Strasner's agency argument is based primarily on its relationship with its direct parent Brightpoint, another nonresident corporation. Because Strasner has failed to demonstrate a relationship between Brightpoint and Ingram indicative of agency, she likewise cannot establish that Touchstone is an agent of Ingram by imputing Brightpoint's contacts with Ingram to Touchstone. In addition, Strasner references Touchstone's payments to vendors in California, but provides no evidence that those payments are made on Ingram's behalf or that there is any other connection between the corporations with regard to such payments that would support an agency relationship.

Based on the foregoing, we conclude Strasner has failed to satisfy her burden to establish that any of the Defendants have sufficient contacts with California to be subject to its general jurisdiction.

12

III. *Specific Jurisdiction*

    A. Legal Principles

    The specific jurisdiction analysis focuses on the " ' "relationship among the defendant, the forum, and the litigation." ' " (*Bristol-Myers Squibb Company v. Superior Court* (2016) 1 Cal.5th 783, 799 (*Bristol-Myers*).) To establish specific jurisdiction, a plaintiff must demonstrate that: (1) the nonresident defendant has purposefully directed its activities at the forum; (2) the litigation is related to, or arises out of, these forum-related activities; and (3) exercise of jurisdiction is reasonable and complies with " ' " 'traditional notions of fair play and substantial justice.' " ' " (*Ibid.*) Once a court has concluded that the first two prongs of the test have been satisfied, the burden shifts to the defendant to show the exercise of jurisdiction would be unreasonable under the third prong. (*Id.* at p. 800; *HealthMarkets, Inc. v. Superior Court* (2009) 171 Cal.App.4th 1160, 1168 (*HealthMarkets*).) If the plaintiff is unable to demonstrate sufficient minimum contacts with the forum to justify jurisdiction, a court is not required to engage in the process of weighing the defendant's inconvenience of litigating in the forum against the plaintiff's interests in suing locally and California's interest in assuming jurisdiction. (*Sipple v. Des Moines Register & Tribune Co.* (1978) 82 Cal.App.3d 143, 153 (*Sipple*).) The relevant time period for measuring the nature and quality of a nonresident defendant's contacts with the forum for purposes of specific jurisdiction is at the time the plaintiff's cause of action arose. (*Cadle Co. II, Inc. v. Fiscus* (2008) 163 Cal.App.4th 1232, 1239 (*Cadle Co. II*).)

In *Bristol-Myers*, the most recent California Supreme Court decision to address specific jurisdiction, the court concluded that California had specific jurisdiction over an out-of-state pharmaceutical manufacturer, Bristol-Myers Squibb (BMS), for the claims of both resident and nonresident plaintiffs who were injured by the misleading marketing and negligent design and manufacture of Plavix, a prescription drug. (*Bristol-Myers, supra*, 1 Cal.5th at p. 813.) The court first determined BMS' conduct satisfied the purposeful availment prong of the specific jurisdiction analysis, because it had marketed and sold Plavix in California, employed sales representatives in California, contracted with a California-based distributor, operated research and laboratory facilities in California and had a lobbying office in Sacramento. (*Id.* at pp. 801-802.) The court further concluded the California plaintiffs' claims concerning misleading marketing of Plavix and injuries resulting from ingesting the drug arose out of BMS' California contacts, satisfying the second prong of the specific jurisdiction test (relatedness of the litigation to the defendant's forum contacts). (*Id.* at pp. 803-804.)

In addition, the court held California had jurisdiction over claims of non-California plaintiffs because their claims were substantially connected to BMS' California conduct. (*Bristol-Myers, supra*, 1 Cal.5th at pp. 807-808.) The court explained a claim need not arise directly from a defendant's forum contacts; rather, the relatedness analysis is a sliding scale with the intensity of forum contacts inversely related to the extent of the connection. (*Id.* at p. 800.) The court concluded under the sliding scale analysis BMS' extensive California contacts were sufficiently related to the nonresidents' claims to satisfy the relatedness requirement under the following facts: (1) the nonresident

14

plaintiffs' claims arose out of the same nationwide sales and marketing campaign used in California; (2) BMS had substantial sales of Plavix in California; and (3) some of the nonresidents' claims were based on negligent research and design, BMS conducted drug research and development activities in California (although not for Plavix) and had therefore availed itself of California's laws governing research activities. (*Id.* at pp. 801-802, 805-806.)

In *Bristol-Myers,* BMS' forum contacts unquestionably satisfied the purposeful availment requirement (which BMS did not contest), as it had extensive business contacts in California, including substantial pharmaceutical sales, research facilities and hundreds of employees. (*Bristol-Myers, supra*, 1 Cal.5th at pp. 801-802.) Generally, the purposeful availment requirement is " 'satisfied when the defendant purposefully and voluntarily directs his activities toward the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on' his contacts with the forum." (*Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 269 (*Pavlovich*).) However, in libel, defamation and some other intentional tort cases, courts have applied an "effects test" to assess the purposeful availment requirement.[2] (*Id.* at pp. 269-270.)

In *Calder v. Jones* (1984) 465 U.S. 783 (*Calder*), the United States Supreme Court established the effects test in connection with a California libel lawsuit. A California actress sued a reporter and editor employed by National Enquirer at its Florida

---

[2] The "effects test" is also described as the "purposeful direction" test by federal courts. (*Gilmore Bank v. AsiaTrust New Zealand Limited* (2014) 223 Cal.App.4th 1558, 1569 (*Gilmore*).)

15

headquarters, based on an article published in its newspaper, which had a California circulation of approximately 600,000. The court concluded California's jurisdiction over the defendants complied with due process because although defendants' activities focused on the plaintiff, defendants also had significant contacts with the forum, as they had communicated with California sources to investigate the article, the article was about plaintiff's activities in California, and the article was widely circulated in the state, causing injury to plaintiff's reputation there. (*Id.* at pp. 788-789.) The court characterized jurisdiction over defendants as based on the "effects" of their Florida conduct in the state, observing their intentional actions were "expressly aimed at California" because they wrote the article knowing it would harm the plaintiff and the greatest impact of the harm would occur in the plaintiff's home state, in which National Enquirer had the largest circulation. (*Id.* at pp. 789-790.)

The effects test was also applied in *Keeton v. Hustler Magazine, Inc.* (1984) 465 U.S. 770, 780-781 (*Keeton*). In *Keeton,* a New York resident brought a libel action against a California-based publication in New Hampshire state court (the only state court in which the statute of limitations had not run).[3] (*Id.* at p. 773.) The court concluded that the California defendant, who sold 10,000 to 15,000 copies of its publication in New Hampshire monthly, could reasonably be expected to be subject to New Hampshire's jurisdiction in light of its continuous and deliberate exploitation of the New Hampshire

---

[3]    The Supreme Court noted that the respective duration of the statutes of limitations in nonforum jurisdictions has nothing to do with the determination of contacts among defendant, the forum state and the litigation. (*Keeton, supra*, 465 U.S. at p. 779.)

16

market.  (*Id.* at pp. 772, 781; cf. *Evangelize China Fellowship, Inc. v. Evangelize China Fellowship Hong Kong* (1983) 146 Cal.App.3d 440, 449 [no specific jurisdiction when the defendant publisher's only connection to California was its mailing of 600 copies per month of a magazine containing an allegedly libelous editorial to California readers and sending receipts to its California financial contributors and California was not the topic of the editorial].)

Under California law, to establish specific jurisdiction through the effects test a plaintiff must show the defendant committed an intentional act, expressly aimed at or targeting the forum state, with the knowledge that his act would cause harm in the state. (*Pavlovich, supra*, 29 Cal.4th at pp. 271-272; see *Gilmore, supra*, 223 Cal.App.4th at p. 1570 ["the effects test requires express aiming at the *forum* (not necessarily at the plaintiff)"].)  In *Pavlovich*, the defendant, a Texas resident, had posted source code on a website that could be used to decrypt the copyright function of DVD's while he resided in Indiana.  (*Pavlovich*, at p. 266.)  The plaintiff, a California organization responsible for licensing the encryption technology, filed a complaint alleging the defendant's misappropriation of trade secrets and contending defendant's posting harmed a wide array of California industries.  (*Id.* at p. 267.)  Defendant asserted that he did not know plaintiff was the licensor of the technology or that it was located in California.  (*Id.* at p. 275.)  The court analogized the defendant's posting on a passive website as akin to placing a product in the stream of commerce, and found that such posting was insufficient to establish purposeful availment when the defendant did not know his conduct would cause harm to the plaintiff in California.  (*Id.* at pp. 274-275.)  The court further concluded that

17

even if the defendant should have known that his conduct would impact California corporations, the mere foreseeability of harm in California did not fulfill the effects test. (*Id.* at pp. 276-278.)

Since *Pavlovich,* a number of courts have conducted jurisdictional analyses in the context of defendants' acts conducted over the internet. For example, in *Burdick v. Superior Court* (2015) 233 Cal.App.4th 8 (*Burdick*), the Court of Appeal considered whether a nonresident defendant's posting of defamatory statements about a California resident on the defendant's personal Facebook page constituted sufficient minimum contacts to subject the defendant to jurisdiction in California and concluded it did not. (*Id.* at p. 25.) The *Burdick* defendant made the post in Illinois, the post did not have a California focus and the plaintiff provided no evidence that the defendant had a significant number of Facebook friends who lived in California or that the page contained advertisements targeting Californians. (*Ibid.*) In addition, the court noted that the defendant's Facebook page was characterized as publicly available, which made it less likely that the defendant had intentionally targeted California. (*Ibid.*) Under these circumstances, the court concluded California lacked personal jurisdiction over the defendant because there was no evidence that the defendant expressly aimed or intentionally targeted his conduct at California, rather than at the plaintiff. (*Id.* at pp. 25-26.)

More recently, the Court of Appeal held that California did not have personal jurisdiction over a nonresident defendant who instituted a campaign to harass and defame a California corporation through threats made on Twitter and in comments posted online.

(*ViaView, Inc. v. Retzlaff* (2016) 1 Cal.App.5th 198, 219.) The court noted that the threats were published to anyone who chose to access them, and were not directed solely to the plaintiff. Moreover, although the plaintiff alleged that the defendant knew the plaintiff's CEO lived in San José and published his California address online, there was no admissible evidence supporting those assertions. (*Id.* at p. 218.) Under those facts, the court determined the plaintiff had failed to demonstrate that the defendant aimed his statements at a California audience, that the social media platforms defendant used were targeted at California, or that a significant number of California residents saw the posts and concluded there was not competent evidence of minimum contacts with California sufficient to allow it to exercise jurisdiction over the defendant. (*Id.* at p. 219; see also *McGibney v. Retzlaff* (N.D.Cal., June 18, 2015, No. 14-CV-01059-BLF) 2015 WL 3807671, at *5 [a plaintiff's conclusory declaration stating the nonresident defendant knew recipients of his e-mail messages were California residents was insufficient to establish targeted forum contacts when such declaration lacked foundation as to the defendant's intent and knowledge]; cf. *Mavrix Photo, Inc. v. Brand Technologies, Inc.* (9th Cir. 2011) 647 F.3d 1218, 1229-1230 [a nonresident defendant's conduct was directed at California when the defendant posted copyrighted pictures of California celebrities on its celebrity gossip website, which also contained third-party advertising for jobs, hotels and vacations in California, establishing the defendant's exploitation of the California market for its own commercial gain].)

19

B. Analysis

In her opening brief, Strasner contends Defendants are subject to specific personal jurisdiction in California because a Touchstone employee in Texas intentionally uploaded her photograph on Facebook. Strasner does not identify, either below or on appeal, the nature of any contacts by BPNA, TAL or Bridgepoint which could form the basis for establishing their purposeful availment of the benefits of the California forum, nor does she provide any reasoned argument or citation to authority to support a finding of purposeful availment with respect to such Defendants. "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785.)

With respect to Touchstone, Strasner contends it is undisputed that her photograph was not uploaded accidently or that the majority of her Facebook friends reside in California. She further contends anyone posting her "private information to her Facebook page would easily be made aware that most of her family and friends were in California." Strasner analogizes the posting of the photograph to her Facebook account, causing it to be sent to her Facebook friends via Facebook's "newsfeed" feature, to the process of mailing copies of the private photograph to each of her Facebook contacts, and claims that the majority of such mail would be sent to California. She further argues the majority of her injury occurred in California, where persons who were most important to her were located. Strasner characterizes the employee's action as targeting not only her, but also "her many friends and family in California."

20

As evidentiary support for her contentions, Strasner relies on her declaration, stating the vast majority of her Facebook friends were from California and such fact would be "clearly realize[d]" by anyone who accessed her account. She further relies on the following facts: the uploaded photo indicated it was "posted from mobile"; the number associated with her returned mobile telephone had a Los Angeles area code; and the telephone also contained private financial information, passwords and medical information. Strasner contends such evidence "gives rise to the reasonable [inference] that Touchstone's employee was able to determine that Strasner had substantial California connections." However, this evidence is insufficient to establish that a Touchstone employee expressly aimed his or her conduct at, or targeted, California with the knowledge that such act would cause harm in the state. (*Pavlovich, supra*, 29 Cal.4th at pp. 271-272.)

Strasner provides no factual evidence to support her contention that the act of uploading her photograph to her Facebook account resulted in a targeted transmission of the photograph to her Facebook friends.[4] (*Automobile Antitrust, supra*, 135 Cal.App.4th at p. 110.) Instead, she relies on descriptions of the Facebook "newsfeed" process contained in her briefing, which is not evidence. In addition, Strasner provides no foundation for the conclusory assertion in her declaration that anyone accessing her

---

[4]     In addition, Strasner described the posting of her picture as "publicly posting" her private photograph and making it available "readily, to anyone with access to her Facebook newsfeed, including but not limited to, her friends, clients . . . and the public." Her characterization of her Facebook page as publicly available makes it less likely that the employee defendant intentionally targeted California. (See *Burdick, supra*, 233 Cal.App.4th at p. 25.)

21

Facebook page would "clearly realize" the majority of her Facebook friends were from California. She also fails to establish how her unspecified financial and medical information and passwords would have informed anyone viewing them that the bulk of her Facebook contacts reside in California. Presumably, as Strasner was living in New York when the posting occurred, to the extent her data showed a current address, it would not be in California. Furthermore, Strasner offers no evidence that the photograph itself provided any indication of her ties to California. Finally, even if a Texas employee may have seen the Los Angeles area code associated with Strasner's discarded mobile telephone, such possibility does not compel an inference that the employee knew the area code was associated with California or that the employee therefore must have known that a substantial number of Strasner's Facebook friends lived in California.

Strasner asserts "it must be said that [Defendants] purposefully directed their activities at California," because they were unable to cite a single case in which any court granted a motion to quash service on a defendant accused of posting information on a plaintiff's Facebook page or personal website, but Strasner likewise was unable to find any case in which a court denied a motion to quash under similar circumstances. Nor has Strasner identified any authority in which a court found specific jurisdiction without sufficient evidentiary support establishing that the defendant's conduct was targeted at the forum state with knowledge that the act would cause harm in the state. Strasner likens her case to *Calder* and *Keeton,* but in both of those cases it was undisputed that the defendants knew a substantial number of the publications at issue were sold in the forum, thus the forum was expressly targeted. (*Calder, supra*, 465 U.S. at pp. 788-789; *Keeton,*

22

*supra*, 465 U.S. at p. 772.) Here, Strasner did not present sufficient evidence that the Facebook posting specifically targeted California. Strasner has therefore failed to establish that Touchstone purposefully availed itself of the California forum through the posting of Strasner's photograph.

At oral argument, Strasner argued for the first time that Touchstone had other business contacts in California through which it could demonstrate specific jurisdiction under *Bristol-Myers*. As noted above, Touchstone made payments to vendors in California and had a single California customer (who was not T-Mobile). These types of deliberate business contacts would appear to satisfy the purposeful availment prong of the specific jurisdiction test. (*Pavlovich, supra*, 29 Cal.4th at p. 269.) However, there is no evidence in the record that such contacts existed at the time Strasner's photograph was posted, which is the relevant time for evaluating Touchstone's contacts with California in order to establish specific jurisdiction. (See *Cadle Co. II, supra*, 163 Cal.App.4th at p. 1239.)

Moreover, even if Touchstone engaged in these contacts at the relevant time and thereby purposefully availed itself of the California forum, Strasner has provided no evidence to satisfy the second prong of the specific jurisdiction test: that there was a substantial connection between her alleged injury and Touchstone's California contacts. (*Bristol-Myers, supra*, 1 Cal.5th at p. 805.) The record does not indicate what the California vendors were paid to do or how the vendors' California activities were connected to Touchstone's Texas refurbishment facility, where the posting of Strasner's photograph allegedly occurred. In addition, although Touchstone admittedly provided

refurbishment services for one California customer at its Texas facility (as it did for T-Mobile), there is nothing in the record to suggest that the alleged mishandling of Strasner's data was part of any common pattern or practice or impacted any of the mobile telephones handled for the California customer.  Therefore, unlike the circumstances in *Bristol-Myers,* in which BMS conducted a nationwide pattern of marketing, promotion and distribution activities which injured both California and nonresident plaintiffs in their home states, there is no demonstrated connection between Touchstone's vendor activity or sales in California and Strasner's claims.  (*Id.* at p. 804.)

Furthermore, Touchstone's California contacts (payments to vendors and sale of services to a California customer), do not appear as extensive as those in *Bristol-Myers,* as BMS had research facilities, lobbyists and employees in California in addition to its California distributor, salesforce and substantial sales of the product at issue.  (*Bristol-Myers, supra*, 1 Cal.5th at pp. 801-802.)  Accordingly, under the sliding scale analysis, Touchstone's California contacts would need to be more closely connected to Strasner's litigation than BMS' contacts were to the *Bristol-Myers* litigation and Strasner has not identified facts to show any connection between Touchstone's business contacts in California and her alleged injury.  (*Id.* at p. 800, 806.)  Strasner has not established Touchstone purposefully availed itself of forum benefits through contacts with California that were substantially related to her alleged injury and therefore has not demonstrated the minimum contacts required for specific jurisdiction.

Strasner also attempts to rely on various factors of the reasonableness analysis and other "plus factors" described in a federal district court case to overcome her failure to

establish minimum contacts. (See *Vons, supra*, 14 Cal.4th at pp. 447-448; *Crane v. Carr* (D.C. Cir. 1987) 814 F.2d 758, 762-763.) However, Strasner presents no authority requiring the court to consider such factors when she has failed to establish the threshold minimum-contact requirement. (See *Sipple, supra*, 82 Cal.App.3d at p. 153.) Furthermore, Strasner fails to establish how any of the "factors" she presents can somehow compensate for the lack of minimum contacts.

We conclude Strasner has failed to establish any Defendant's minimum contacts with California sufficient to allow for the exercise of specific jurisdiction.

### DISPOSITION

The trial court's order granting Defendants' motion to quash service of process for lack of jurisdiction is affirmed. Defendants are entitled to costs on appeal.

McCONNELL, P. J.

WE CONCUR:

BENKE, J.

O'ROURKE, J.

25